UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Valerie Richardson Angolano,

       Plaintiff,

       v.                                 Civil Action No. 2:13-cv-321

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.

## OPINION AND ORDER
(Docs. 13, 14)

Plaintiff Valerie Richardson Angolano brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for Social Security Income. Pending before the Court are Angolano's motion to reverse the Commissioner's decision (Doc. 13), and the Commissioner's motion to affirm the same (Doc. 14). For the reasons stated below, Angolano's motion is DENIED, and the Commissioner's motion is GRANTED.

## Background

Angolano was 33 years old on her alleged disability onset date of December 2, 2000. She graduated from high school and then completed cosmetology school. After receiving her cosmetology license, she worked as a cosmetologist from around 1986 until 1990. But neither this work, nor any other jobs she has had, rose to the level of past relevant work for social security purposes.

Angolano is divorced and has two children who were ages 14 and 20 in June 2010. (AR 27–28.) She lived in Arizona with her husband and kids for seven years, moving to Vermont in around 2006 to be closer to her parents. (AR 586.) She has a long history of obesity, losing over 100 pounds between 2005 and 2007. (AR 331, 950.) In April 2006, Angolano was smoking two to three packs of cigarettes each day, but by October 2008, she had cut back to one pack a day. (AR 332, 668.)

In December 2000, Angolano was involved in an automobile accident, leaving her with chronic severe back pain. (AR 586, 610.) Her doctors prescribed morphine and tramadol, but they have not relieved her pain completely. (AR 30, 34, 1688, 1691.) She has tried physical therapy and weight loss to relieve the pain, but neither has worked; she has considered surgery but her doctors have advised it is not a good option. (AR 30, 586.) At Angolano's first administrative hearing, in June 2010, she testified that her lower back pain is constant, precludes her from sitting or standing for more than 10 to 15 minutes at a time, and limits her ability to bend over and lift things. (AR 29–31.) Angolano further testified that she is unable to work because the medications she takes to relieve her pain make her sleepy. (*Id.*) At Angolano's second administrative hearing, in October 2012, she again testified about how her medications affect her, stating that they make her drowsy and dizzy, forcing her to take several naps each day. (AR 1685, 1689–90.) She further stated that she can sit or stand for only 5 to 10 minutes at a time, and walking causes pain radiating down the back of her right leg into the sole of her foot and in the buttocks. (AR 1686, 1690–91.) She also described pain and tingling/numbness in her right hip. (*Id.*; AR 1687.)

In June 2010, Angolano was living with her parents and her 14-year-old daughter in her parents' house.  (AR 28.)  On a typical day, she slept on and off, laid down two or three times using body pillows to relieve the pain, read books, walked around, ate, showered (with difficulty), used the computer (doing email and balancing her checkbook), occasionally went to the movies and out to dinner, occasionally went to the pharmacy and to her doctor's office, and drove a car maybe once a week.  (AR 28, 31–33.)  She stated that her mother did the cooking and household chores.  (AR 31, 34.)  As of October 2012, Angolano's daily schedule had not changed, except that she had moved from her parents' house to an apartment where she lived with her 17-year-old daughter; and her daughter was doing most of the driving as well as the household chores.  (AR 1683–84.)

In February 2009, Angolano filed an application for Social Security Income, alleging that, as of December 2, 2000, she has been unable to work due to pain in her lower back, hip, right leg, and right foot.  (AR 29, 142, 171–75.)  Angolano's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  Administrative Law Judge (ALJ) Dory Sutker conducted the hearing on June 23, 2010.  (AR 21–45.)  Angolano appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified at the hearing.  About a month later, the ALJ issued a decision finding that Angolano was not disabled at any time from her alleged disability onset date through the date of the decision.  (AR 7–14.)  Thereafter, the Decision Review Board failed to review the ALJ's decision within the prescribed period,

rendering it the final decision of the Commissioner. (AR 1–3.) Having exhausted her administrative remedies, Angolano sought judicial review.

On November 17, 2011, this Court issued an Opinion and Order remanding the claim to the Commissioner for further proceedings and a new decision. (AR 985–94.) About a year later, in October 2012, ALJ Sutker held a second administrative hearing, at which Angolano again appeared and testified, represented by counsel. (AR 1672–1735.) A VE also testified at the hearing, as well as a medical expert, orthopedic surgeon Dr. Louis Fuchs. On November 20, 2012, the ALJ issued a second decision finding that Angolano was not disabled at any time from her alleged disability onset date through the date of the decision. (AR 943–56.) It is this decision under review here. The decision became final when the Appeals Council found no reason to assume jurisdiction. (AR 934–37.) Having again exhausted her administrative remedies, Angolano filed a Complaint in this Court on December 31, 2013. (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404,

4

Subpart P, Appendix 1 (the Listings). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis in her November 2012 decision, ALJ Sutker first determined that Angolano had not engaged in substantial gainful activity since January 29, 2009, her disability application date. (AR 945.) At step two, the ALJ found that Angolano had the following severe impairments: degenerative disc disease, myofascitis, radiculitis, obesity, and diabetes mellitus. (*Id.*) At step three, the ALJ found

that none of Angolano's impairments, alone or in combination, met or medically equaled

a listed impairment. (AR 946.) Next, the ALJ determined that Angolano had the RFC to

perform light work, as defined in 20 C.F.R. § 404.1567(b), except as follows:

> [Angolano] could occasionally lift and carry twenty pounds and frequently
> lift and carry ten pounds; c[ould] stand and walk for a total of six hours and
> sit for a total of six hours in an eight-hour day, with an option to alternate
> positions at will; she would have to avoid climbing ladders, ropes, or
> scaffold[s]; she could occasionally climb stairs but would need to avoid
> ramps while at work; she would have to avoid driving on the job; she
> should avoid hazards, pulmonary irritants such as dusts, fumes, odors, or
> poor ventilation, and vibrations; and she would be limited to uncomplicated
> tasks, meaning tasks that can typically be learned in thirty days or less.

(*Id.*) At step four, the ALJ found that Angolano had no past relevant work. (AR 954.)

Nonetheless, the ALJ determined that Angolano could perform other jobs existing in

significant numbers in the national economy, including laundry sorter, price marker,

packing-line worker, inspection-table worker, final assembler of optical goods, and

production inspector. (AR 955.) The ALJ concluded that Angolano had not been under a

disability from the date her application was filed through the date of the decision. (AR

956.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Angolano argues that the ALJ erred in her analysis of the opinions of treating physician Dr. Daniel Donnelly and medical expert Dr. Louis Fuchs, and applied an incorrect legal standard in assessing Angolano's credibility.  In response, the

Commissioner claims that the ALJ complied with the applicable legal standards, and that substantial evidence supports the ALJ's RFC determination, including her analysis of the medical opinions and assessment of Angolano's credibility. For the following reasons, the Court finds in favor of the Commissioner.

## I. The ALJ's analysis of the treating physician's opinions was proper.

In June 2007, Angolano had her first appointment with primary care physician Dr. Donnelly. (AR 284.) Angolano told Dr. Donnelly that she had had back pain since her 2000 automobile accident, and was having problems "over the last few days," including an "aching and spasm radiating into [her] right leg and . . . a burning in the sole of her right foot." (*Id.*) Around two months later, Dr. Donnelly was asked to give an opinion regarding Angolano's disability application, but he declined, stating that Angolano was "a relatively new patient here." (AR 276.) In May 2008, due to Angolano's reports of continued back issues, Dr. Donnelly ordered an MRI and referred Angolano for a neurology appointment at Fletcher Allen Healthcare. (AR 307, 311.) The lumbar MRI revealed disc herniation at two levels with no apparent nerve impingement and multilevel disc degeneration. (AR 434–35.)

In November 2008, Dr. Donnelly wrote a letter in support of Angolano's disability application (AR 366) and completed an assessment of Angolano's RFC (AR 369–74), stating in treatment notes that this paperwork was "based on [Angolano's] responses" (AR 364). In the letter, Dr. Donnelly opined that Angolano's chronic back pain "severely limits" her ability to do physical activities, as "she is very uncomfortable maintaining any specific position[] for long," and concluded that Angolano "is quite significantly

disabled." (AR 366.) In the RFC assessment, Dr. Donnelly opined that Angolano could lift and carry only up to 10 pounds occasionally, and sit, stand, and walk for only 20 to 30 minutes at a time and for only one hour total in an eight-hour workday; that her ability to reach with her hands and operate foot controls was significantly restricted; and that she had significant postural and environmental restrictions. (AR 369–73.) A few months later, in March 2009, Dr. Donnelly wrote another letter in support of Angolano's disability application, stating, "I do think [Angolano's] disability is very significant," but declining to give a "percentage of disability," recommending evaluation "by those who specialize in [back pain]." (AR 512.)

In September 2010, Dr. Donnelly submitted a letter stating that Angolano was "on a significant regimen of opioid pain medications," and that he thought "both [Angolano's] back pain and her medications can affect her abilities to do work-related activities," including sitting, standing, walking, lifting, carrying heavy objects, concentrating, and socializing. (AR 1375.) In January 2011, Dr. Donnelly prepared yet another letter in support of Angolano's disability application, again stating that he believed her ability to do work-related activities was "very limited" because of her back pain and her need to change position frequently. (AR 1410.) About 18 months later, in July 2012, Dr. Donnelly completed another assessment of Angolano's RFC, this time opining that Angolano could lift and carry only up to 10 pounds occasionally; could sit, stand, and walk for only 30 minutes at a time; and could sit for four hours, stand for two hours, and walk for one hour total in an eight-hour workday. (AR 1607–08.) Dr. Donnelly further opined that Angolano's ability to reach with her hands and operate foot

controls was significantly restricted, and that she had postural and environmental restrictions. (AR 1609–11.) Regarding Angolano's mental limitations, Dr. Donnelly opined that Angolano would have no difficulty understanding, remembering, and carrying out instructions, but her medications could cause drowsiness. (AR 1604–05.) Dr. Donnelly concluded that Angolano would miss more than four days of work each month due to her mental impairments or treatment. (AR 1606.)

Under the "treating physician rule," the opinions of a treating physician such as Dr. Donnelly are afforded "controlling weight" when they are "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial [record] evidence." 20 C.F.R. § 404.1527(c)(2). Even when a treating physician's opinions are not given controlling weight, the opinions are still entitled to some weight, given that such physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.* The deference given to a treating physician's opinion may be reduced, however, upon consideration of several factors, including the length and nature of the treating physician's relationship with the claimant, the extent to which the medical evidence supports the physician's opinion, whether the physician is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors which tend to contradict the opinion. *Id.* at (c)(2)–(6); *see also Halloran v. Barnhart*, 362 F.3d 28, 32

(2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion[s] of a claimant's treating physician, the[se] opinion[s] . . . [are] not afforded controlling weight where, as here, the[y] . . . are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.") (citation omitted). When controlling weight is not afforded to a treating physician's opinions, the ALJ's decision must contain "specific reasons" for the weight given to those opinions, supported by the evidence in the case record; and the decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating [physician's] medical opinion[s] and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see Schaal v. Apfel*, 134 F.3d 496, 503N04 (2d Cir. 1998) (where an ALJ gives a treating physician's opinions something less than controlling weight, he must provide "good reasons" for doing so).

Angolano claims Dr. Donnelly's opinions are well supported and not inconsistent with other substantial evidence, and that the ALJ did not give good reasons for rejecting them. The Court disagrees. The ALJ stated: "I . . . considered the multiple opinions of the claimant's treating physician Harley Daniel Donnelly, M.D.," and then proceeded to describe these opinions in detail. (AR 951–52). The ALJ then stated that she afforded "only some weight" to Dr. Donnelly's opinions for five reasons. (AR 952–53.) First, the ALJ stated that Dr. Donnelly "is only a family doctor," lacking "specific expertise concerning [Angolano's] alleged symptoms." (AR 952.) This was a proper factor to consider in analyzing Dr. Donnelly's opinions. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to

his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, Dr. Donnelly is indeed a primary care physician and not an expert in the musculoskeletal issues afflicting Angolano. Dr. Donnelly himself recognized this fact, frequently deferring to specialists in his treatment of Angolano, referring her to Dr. Ryan Jewell, a neurosurgeon, and to Fletcher Allen's pain clinic. (AR 307, 311, 557, 560, 829.) Dr. Donnelly stated in a March 2009 letter: "At this point, I feel that [Angolano] is significantly disabled, although I can't give a percentage of disability and for that, I think she would need to be evaluated by those who specialize in such work." (AR 512.)

Second, the ALJ stated that Dr. Donnelly's treatment notes revealed that his treatment of Angolano entailed "primarily only monitor[ing] [Angolano's] medicines, rather than providing consistent and detailed objective examinations." (AR 952.) This was another proper factor to consider in assessing Dr. Donnelly's opinions. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("We will look at the treatment the [treating] source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."). Given that Dr. Donnelly was a primary care physician and not a specialist, and Angolano's medical issues required treatment from specialists, Dr. Donnelly's major function was monitoring medications and ensuring that Angolano was referred to the proper specialists when needed. (*See, e.g.*, AR 1352 (pain clinic physician stating: "I will leave [any required modification of the current medication regimen] to [Angolano] and her [primary care physician,] who has done an excellent job thus far.").)

Third, the ALJ gave only some weight to Dr. Donnelly's opinions because, although he stated in his RFC assessment that Angolano's symptomology dates back to 2000, the doctor "did not even begin treating [Angolano] until seven years later, in 2007." (AR 952; *see* AR 284, 1612; *see also* AR 1375.) It was proper for the ALJ to give less weight to those portions of Dr. Donnelly's opinions that relate to a period of time when he did not treat her, particularly where there is no indication that Dr. Donnelly reviewed medical records from that period which support those opinions. Also noteworthy, the record from the period before Dr. Donnelly began treating Angolano indicates that there were long periods when Angolano did not seek any treatment for her back issues: it appears that she saw Pierre Angier, D.O., in May 2001 (AR 627–28), and then did not seek other substantial treatment for her back pain until she began treating with Dr. Donnelly in June 2007 (AR 284). This is reflected in a May 2005 treatment note establishing care with primary care physician Dr. Indu Partha, which does not indicate that back pain was one of Angolano's complaints at the time (AR 421), and which states that Angolano "walks six days a week . . . for a mile to a mile and a half" (AR 422). (*See also* AR 200 (March 2007 consultation report indicating that Angolano had not seen a doctor in seven months).)

Fourth, the ALJ found that Dr. Donnelly's opinions "lack requisite detail and objective support." (AR 952.) The ALJ explained that in some of Dr. Donnelly's opinions, particularly the earlier ones, Dr. Donnelly "fails to provide any specific limitations or rationale whatsoever," instead "just providing blanket statements that [Angolano] is disabled." (AR 952–53.) The ALJ also pointed out that, in his RFC

assessments, Dr. Donnelly "only checked boxes on a list," failing to provide any supporting explanation or narrative. (AR 953.) It was proper for the ALJ to consider the supportability of Dr. Donnelly's opinions and whether those opinions are on the ultimate issue of whether Angolano was disabled. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner[, including whether an individual is 'disabled' under the Social Security Act,] are never entitled to controlling weight or special significance."). Moreover, the ALJ's description of Dr. Donnelly's opinions is accurate; many of them are conclusory and vague. For example, in a November 2008 letter, Dr. Donnelly stated: "I believe [Angolano] is quite significantly disabled." (AR 366.) Similarly, in a March 2009 letter, Dr. Donnelly stated: "At this point, I feel that [Angolano] is significantly disabled . . .[;] I do think her disability is very significant." (AR 512.) And in a September 2010 letter, Dr. Donnelly stated: "I think that both the back pain and her medications can affect [Angolano's] abilities to do work-related activities . . . [and] [her] medications may affect her ability to concentrate and with social interactions." (AR 1375; *see also* AR 1410.) No supporting objective medical evidence is provided in these letters. And the RFC assessments completed by Dr. Donnelly are, as the ALJ described, essentially check-the-box forms with very little additional details provided by the Doctor. (*See* AR 369–74, 1604–12.)

The fifth and final reason provided by the ALJ for affording only "some weight" to Dr. Donnelly's opinions is that they are "inconsistent with the other medical evidence of record, as well as [with] his own treatment notes and observations." (AR 953.) The ALJ explained that many of Dr. Donnelly's treatment notes do not contain objective observations about Angolano's back pain, and his first treatment note—which does contain objective observations—records objective findings that do not correlate with Dr. Donnelly's opinion that Angolano could not work. (*Id.*) The record supports this finding (*see, e.g.*, AR 760 (recording normal strength and sensation of the lower extremities, among other negative findings); AR 1364 (recording height, weight, blood pressure, pulse, respirations, and temperature, but "defer[ing]" "[t]he rest of the exam")), and reveals that Dr. Donnelly did not refer Angolano for specialized treatment of her back pain until almost a year after he began treating her (AR 311). Further, many of Dr. Donnelly's treatment notes relate to other medical problems—such as bloating, asthma-related issues, and a yeast infection—and do not discuss her back pain. (*See, e.g.*, AR 1400, 1451–54.) Also noteworthy, in a few of these and other treatment notes, Dr. Donnelly stated that Angolano was "doing well." (AR 1453.) For example, in an October 15, 2010 note, despite her complaints of feeling bloated, Dr. Donnelly stated that Angolano was "[g]enerally . . . doing well" and her pain was "managed well." (AR 1400.) These statements conflict with Dr. Donnelly's statements in an opinion letter from just two weeks earlier (September 29, 2010) that Angolano had "significant pain without relief [from her] . . . significant regimen of opioid pain medications," and that her pain and medications could affect her abilities to do work-related activities. (AR 1375.)

Also, in April and July 2012 treatment notes, Dr. Donnelly stated that, although Angolano continued to have back pain and was experiencing a lot of stress in her life, she "feels like things are stable" and "is at least well managed" on her medications. (AR 1660, 1668.)

As noted by the ALJ, treatment notes from providers other than Dr. Donnelly also indicate that Angolano's back pain was not as severely debilitating as Dr. Donnelly believed. For example, although treatment notes from the Kiva Medical Group sometimes record "back pain" as an issue, they do not reflect this being a significant problem that affected Angolano's ability to function on a daily basis. (AR 634–41.) And treatment notes from the University Medical Center indicate that Angolano was treated for diabetes, a yeast infection, eye swelling, and asthma; but there were no complaints of significant back pain. (AR 378, 405, 409–10, 421–24, 647.) As noted above, a May 2005 note from Dr. Partha even states that Angolano was able to walk for a mile to a mile and a half six days a week. (AR 422.) A June 2010 treatment note from Dr. Ian Black at Fletcher Allen's pain clinic indicates that Angolano reported "having significant benefit" from her medications, including "substantially improved pain control throughout the day" from the morphine. (AR 1352.) The note further states that Angolano reported she was "quite functional throughout the day," despite experiencing "significant pain" requiring some tramadol in the afternoons. (*Id.*) Although Dr. Black recommended that Angolano continue to work with Dr. Donnelly to modify her medications to "optimize the regimen," Angolano reported that she was "happy with her pain control compared to previously" and was "significantly more functional throughout the day." (*Id.*) These

medical records are not consistent with Dr. Donnelly's opinion that Angolano's back pain and medication use left her unable to work.

Angolano argues that Dr. Donnelly's opinions are supported by those of consulting examiner Dr. Richard Morrison, but the Court finds to the contrary. In his March 2007 report, Dr. Morrison concluded that mentally, Angolano seemed "intact and sharp"; and physically, although she moved "gingerly," he "[could not] definitively say that she ha[d] a back problem" because he did not have the MRI reports. (AR 202–03.) In his April 2009 consultation report, although he noted some positive range of motion findings, Dr. Morrison recorded mostly normal neurologic findings other than a "[v]ery slow and gingerly gait." (AR 575.) Dr. Morrison concluded: "Physically, I do not have enough of the neurological history to verify how much pathology [Angolano] has in her back." (*Id.*) In his December 2010 report, although he again noted some positive range of motion findings, Dr. Morrison recorded mostly normal neurologic findings other than a "[s]low, but steady gait." (AR 1404.) Dr. Morrison opined that the "biggest factor" preventing Angolano from working was "the amount of narcotics she is on." (*Id.*) In contrast, as discussed above, Dr. Donnelly opined that Angolano could not work because of her severe pain and significant postural restrictions. Dr. Morrison's opinions are therefore not substantially supportive of Dr. Donnelly's. Moreover, the ALJ correctly afforded "only some weight" to Dr. Morrison's opinions for the specific reasons stated in her decision, principally that: (1) the limitations cited in Dr. Morrison's reports are largely based on Angolano's own self-reporting rather than Dr. Morrison's objective

observations; and (2) Dr. Morrison's objective findings are not particularly significant. (AR 953–54.)

Angolano also argues that Dr. Donnelly's opinions are supported by those of agency consultant Dr. Ward Stackpole.  In January 2011, Dr. Stackpole completed an assessment of Angolano's RFC, and opined that she retained the capacity to lift and carry up to ten pounds occasionally, sit for six hours in a workday, and stand/walk for two hours in a workday; and that she needed to alternate positions, and could only occasionally engage in postural activities.  (AR 968–69.)  The ALJ did not discuss Dr. Stackpole's opinions in particular,[1] but she generally referenced "the opinions of the various State examiners of record," giving them "limited weight" for the following reasons: "even the most recent opinion was rendered more than a year before the hearing," and none of these sources "personally observed [Angolano] or engaged in treatment of any kind."  (AR 954.)  This rationale accurately applies to Dr. Stackpole's opinions: like the other agency consultants, Dr. Stackpole did not personally observe or treat Angolano, and his assessment was in fact completed well over a year before the October 2012 administrative hearing.  Also noteworthy, the ALJ's RFC determination accounts for portions of Dr. Stackpole's opinions, restricting Angolano to sitting for only six hours in a workday with an option to alternate positions at will.  (AR 946.)  The Court

---

[1]  "'[A]n ALJ is not required to discuss every piece of evidence submitted.'"  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  Moreover, "'[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.'"  *Id.*

finds no error, and does not agree that Dr. Stackpole's opinions required the ALJ to afford more weight to the opinions of Dr. Donnelly.

For these reasons, the Court finds that the ALJ did not err in giving only some weight to the opinions of treating physician Dr. Donnelly.

## II.     The ALJ's analysis of the medical expert's opinions was proper.

Angolano next argues that the ALJ erred in her analysis of the opinions of medical expert Dr. Fuchs, an orthopedic surgeon who testified at the October 2012 administrative hearing.  In relevant part, Dr. Fuchs testified that, based on his review of Angolano's records, including her MRI results, Angolano would experience no limitations in her ability to lift, carry, sit, stand, walk, reach, stoop, kneel, crouch, crawl, or engage in handling and manipulative activities; but would be limited to only occasional use of foot controls.  (AR 1696–97, 1699.)  Dr. Fuchs explained that, although imaging revealed some defects in Angolano's thoracic and lumbar spine as well as global disc degeneration (AR 1706), there is little evidence to substantiate or explain her allegations of impaired motion (AR 1694–95).  He stated that "the muscular neurologic systems were satisfactory" (AR 1703); "neurologically[, Angolano], for the most part, is intact" (AR 1715); and he could "find nothing in the record showing muscular . . . or reflex deficits or continued sensory impairment to indicate [inadequate] function of the lower limbs" (AR 1702).  Dr. Fuchs acknowledged that it was possible for Angolano's MRI findings to correlate with discomfort and pain in a patient, but stated that that was probably not the situation here.  (AR 1707–12.)  More specifically, Dr. Fuchs explained that Angolano's

disc herniation, as seen in MRI, "in and of itself cannot be determined to produce pain," as there needs to be "correlating physical findings attributed to that level having deficits." (AR 1707–08.)

Dr. Fuchs further testified that if Angolano was "walking around sedated," that could preclude work; but he found nothing in the record to indicate that she was in fact sedated: "nothing about her slurring speech or shuffling other than one instance . . . in March 2010." (AR 1703; *see also* AR 1701.) Noting that a person who is narcotic dependent has less tolerance for pain (AR 1715) and can develop a tolerance to their medications (AR 1700–01), Dr. Fuchs concluded: "I think basically what you have here is a woman who is narcotic dependent, very fragile, and cannot probably tolerate much discomfort" (AR 1712). Thus, Dr. Fuchs stated that the issue of whether Angolano's alleged pain was "real" "comes down to a credibility question which [he was] not willing to assess in her favor." (AR 1724.) Dr. Fuchs explained: "I think someone on increasing doses of narcotics is questionable." (*Id.*)

After discussing Dr. Fuchs's testimony and opinions in detail, the ALJ rejected the Doctor's opinion that Angolano could perform work at all exertional levels, but gave "substantial weight" to his opinions as a whole, finding that they were supported by the record. (AR 950–51.) The ALJ noted in particular that the opinions of treating neurosurgeon Dr. Ryan Jewell are consistent with those of Dr. Fuchs. (AR 951 (citing AR 330).) As discussed in the ALJ's decision, Dr. Jewell stated in an October 2008 treatment note that Angolano's symptomology and pain did not "fit" with her objective

radiographic findings, and thus she was not a surgery candidate. (AR 330.) Dr. Jewell recommended that Angolano "reengage herself in a formal physical therapy program." (*Id.*) Despite Angolano's claim to the contrary, the consultation reports of Dr. Morrison, discussed above, are also consistent with Dr. Fuchs's and Dr. Jewell's respective opinions that the objective medical evidence does not correlate with the degree of pain and functional limitation alleged by Angolano. (*See* AR 202–03, 573–75, 1402–04.)

The Court finds no error in the ALJ's allocation of more weight to the opinions of Dr. Fuchs than to those of Dr. Donnelly. Although in many cases it is proper for the ALJ to give reduced weight to the opinions of non-examining consultants such as Dr. Fuchs, in favor of the opinions of the examining medical providers such as Dr. Donnelly; the regulations clearly permit the opinions of the consultants to override those of the examining providers, when the former are more consistent with the record evidence than the latter. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) (citing *Schisler v. Sullivan*, 3 F.3d 567–68 (2d Cir. 1993)) ("[T]he regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."); SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."). Here, the opinions of medical expert Dr. Fuchs are more consistent with the record than those of treating physician Dr. Donnelly, as discussed above. Thus, the ALJ acted within her discretion in weighing the opinions of Dr. Fuchs more heavily than those of Dr. Donnelly.

**III.** **The ALJ's credibility assessment is supported by substantial evidence.**

Finally, Angolano asserts that the ALJ erred in her assessment of Angolano's credibility, applying an incorrect legal standard and improperly citing to evidence from a period outside the alleged disability period. (Doc. 13-1 at 18.) The Court disagrees, and finds that the ALJ's credibility assessment is legally proper and supported by substantial evidence.

It is the function of the Commissioner, not the court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). If the Commissioner's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints. *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996). An important indicator of the credibility of a claimant's statements is their consistency with other information in the record, including the claimant's medical treatment history. *Id.* at *5, *7.

Here, the ALJ found that Angolano's statements concerning the intensity, persistence, and limiting effects of her symptoms are "not credible to the extent they are inconsistent with the above [RFC] assessment." (AR 947.) Angolano claims that this finding improperly "presupposes that the ALJ made h[er] RFC determination first and then considered Ms. Angolano's testimony or statements to be not credible if they did not

fit within h[er] predetermined RFC finding." (Doc. 13-1 at 18.) Angolano further claims that this finding is "meaningless boilerplate that provides no reasoning nor factual support." (*Id.*) Angolano's point is well taken[2]; and if the ALJ did not further address the basis for her assessment of Angolano's credibility, the Court would agree. *See Lumpkin v. Colvin*, No. 3:12cv1817 (DJS), 2014 WL 4065651, at *10 (D. Conn. Aug. 13, 2014) ("The phrasing of this boilerplate language is, at best, confusing, and if the decision did not further address the basis for the ALJ's determination regarding [the claimant's] credibility, the Court would be inclined to agree with the plaintiff."). But after making the above statement, the ALJ proceeded to explain her assessment of Angolano's credibility with citation to the evidence, including to Angolano's own testimony. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (holding that inclusion of boilerplate language stating claimant's statements are not credible to the extent they are inconsistent with the "above" RFC, may be harmless "[i]f the ALJ has otherwise explained his conclusion adequately," offering reasons grounded in the evidence); *Wages v. Comm'r of Soc. Sec.*, Civil Action No. 3:11–CV–1571 (JCH), 2013 WL 3243116, at *4 (D. Conn. June 26, 2013).

---

[2] The Seventh Circuit has noted that determining a claimant's RFC before assessing her credibility "gets things backwards," because it "implies that ability to work is determined first and is then used to determine the claimant's credibility," *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), when in fact, the regulations require that the ALJ make a credibility assessment before determining RFC because the credibility assessment is used to determine the claimant's limitations and RFC, *Faherty v. Astrue*, No. 11–CV–02476 (DLI), 2013 WL 1290953, at * 16 (E.D.N.Y. Mar. 28, 2013) (citing 20 C.F.R. § 404.1529(c)(4)). Stated differently, "the ALJ cannot claim that [the claimant's] testimony is not credible because it is inconsistent with the RFC, when that testimony, in part, should be used to determine the RFC." *Faherty*, 2013 WL 1290953 at *16.

The ALJ made the following specific findings explaining her negative assessment of Angolano's credibility: (1) there were gaps in Angolano's treatment history, including a seven-month gap documented in a March 2007 consultative examination[3]; (2) the objective medical evidence—including MRI scans—does not support any neurological deficits, as medical expert Dr. Fuchs testified and treating physician Dr. Jewell stated in treatment notes; (3) multiple treatment notes record Angolano's clinical presentation at medical appointments as generally normal, and fail to support her profound degree of subjective limitations; (4) despite Angolano's testimony that her medications left her too sleepy and dizzy to work, the evidence does not indicate that she appeared sedated at medical appointments, which Dr. Fuchs testified is an observation that doctors should generally include in their treatment notes, and she did not appear sedated at the October 2012 administrative hearing; and (5) Angolano herself testified that she receives at least some meaningful pain relief from her prescribed medications, and treatment notes indicate the same.  (AR 948–51; *see* AR 28–29, 200, 202, 332, 627–28, 1685, 1688–89, 1701, 1703.)

Substantial evidence supports these findings, and the ALJ's conclusion that the record as a whole undermines Angolano's credibility regarding allegations of extreme

---

[3]  There is no merit to Angolano's argument that this seven-month gap in treatment (and all other evidence from before January 2009) is irrelevant because it occurred before the "period of inquiry," which did not begin until January 29, 2009, the date on which Angolano filed her disability application. (Doc. 15 at 7.)  The 2007 treatment gap is relevant in assessing Angolano's credibility, given that she has alleged that she could not work beginning on December 2, 2000.  (AR 127, 138, 142, 1170.)  Moreover, Angolano herself relies on evidence from before January 2009 in support of her claim.  (*See, e.g.*, Doc 13-1 at 10 (citing AR 342, Dr. Jewell's treatment notes from June 2008, and AR 1327, Dr. Ramundo's treatment notes from October 2008).)

functional limitations due to pain is reasonable.  Although in some cases a claimant's

pain itself may merit a conclusion of disability even if not corroborated by objective

medical findings, *see Rivera v. Schweiker*, 717 F.2d 719, 724 (2d Cir. 1983), the ALJ was

not obligated to accept Angolano's allegations of pain and characterization of the record

without question, especially when there is little medical evidence supporting these

allegations, *see Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("the ALJ is required to

take the claimant's reports of pain and other limitations into account, but is not required

to accept the claimant's subjective complaints without question; he may exercise

discretion in weighing the credibility of the claimant's testimony in light of the other

evidence in the record") (citations omitted).  Given that the ALJ's credibility assessment

is supported by substantial evidence, and the credibility findings of an ALJ are "entitled

to great deference and therefore can be reversed only if they are patently unreasonable[,]"

the Court does not disturb the ALJ's credibility assessment of Angolano.  *Pietrunti v.

Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997)

(internal quotation marks omitted).

## Conclusion

For these reasons, the Court finds that the ALJ's analysis of the medical opinions

and assessment of Angolano's credibility were proper; and that the ALJ's decision is

supported by substantial evidence.  Therefore, the Court DENIES Angolano's motion

(Doc. 13), GRANTS the Commissioner's motion (Doc. 14), and AFFIRMS the decision

of the Commissioner.

Dated at Burlington, in the District of Vermont, this 20th day of April, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge